# **EXHIBIT 3**



## MANAGEMENT BONUS AGREEMENT

Burns & Wilcox, Ltd.[1], a Michigan corporation ("Employer") wishes to link a portion of Employee (defined herein) compensation to Employee's production and the production of those who work with Employee, creating an incentive for Employee to increase his or her production. Therefore, it is agreed that the Employer will pay the Employee, in addition to his or her annual salary, a Bonus (defined herein) which shall be calculated in accordance with the schedule set forth in the Addendum subject to the terms and conditions set out herein. Although this Management Bonus Agreement is continuously binding upon the Employee throughout his or her entire employment with the Employer and need not be annually re-executed, re-signed, or renegotiated to be enforceable and binding, the Addendum may be amended annually by the Employer, under certain circumstances, the Employer and Employee shall resign a new addendum. The Management Bonus and the ancillary Addendum that is in effect during any period shall be referred to as the "Agreement" for the purposes of that Period.

1. **DEVELOPMENT AND PAYMENT RECORD**

    a. **Timing of Payment Calculation.** The Management Bonus, as defined in the Addendum, shall be paid to eligible employees in the time, manner and calculation as set forth in the attached Addendum. The payment shall be based upon the performance of Employee's Department/Office. Any other bonuses that may be payable to Employee are set forth in the Addendum. In the Agreement, the Performance Award and any other bonus otherwise set forth in the Addendum shall be referred to collectively as the "Bonus."

    b. **Timing of Payment.** Final computation and payment of the Performance Award shall occur within 75 days following the close of the applicable Performance Period (defined herein) in which it is earned. Any other bonus that may be due to Employee shall be paid within the time period set forth in the Addendum to this Agreement.

2. **ELIGIBILITY CRITERIA**

    In addition to the other eligibility criteria set out herein, to be eligible under this Agreement to receive any Bonus, the Employee must:

    a. be actively employed by Employer at the time the Bonus is paid;

    b. be properly licensed to transact insurance business as required by all applicable laws during the entirety of the Performance Period for which any Bonus is to be earned;

    c. re-sign the Addendum to this Agreement, as may be amended by Employer, within 10 days of the commencement of the applicable Performance Period, as defined in the Addendum;

---

[1] The parties agree that all references to Employer, Company, or H.W. Kaufman Financial Group, Inc. in this Agreement shall include Burns & Wilcox, Ltd., AJK Enterprises, Inc., AJK Holdings, LLC, AJK Toronto, Ltd. and AJK London, LLC and all of their owners, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, corporate subsidiaries, parents, brother companies, affiliates, (and agents, directors, officers, employees, representatives and attorneys, of said subsidiaries and affiliates) and all persons acting by, through, under or in concert with any of them. Any reference to "Burns & Wilcox" in this Agreement, moreover, shall refer to Burns & Wilcox, Burns & Wilcox Brokerage and Burns & Wilcox, Ltd.

Revised: February 2019

  d. have executed an agreement similar to this Agreement.

3. **DEFINITION AND METHOD OF CALCULATION**

  a. **Definition of Performance Period.** "Performance Period" shall be defined as set forth in the Addendum.

  b. **Definition of Net Income.** "Net Income" shall be defined as set forth in the attached Addendum..

  c. **Definition of Salary.** The term "Salary" as used in this Agreement and the Addendum shall refer only to Employee's standard wages during any applicable Performance Period. "Salary" shall not include and Bonus payable under this Agreement and shall not include any other compensation not guaranteed to Employee in any given year.

4. **TERMINATION OF EMPLOYMENT**

  a. **Definition of Termination Date.** "Termination Date" shall mean the date upon which the Employee ceases to be employed by the Employer and does not include any period following the date on which an Employee is notified that his or her employment or services are terminated during which the Employee is eligible to receive any statutory, contractual or common law notice or compensation in lieu thereof or severance payments unless the Employee is actually required by the Employer to provide services during such notice period. In the event of death or disability of Employee while still employed by Employer, the "Date of Termination" shall be the date of the Employee's death or the date upon which the Employee becomes terminated and is unable to return to Employee's prior duties and responsibilities with Employer.

  b. **Death or Disability Pro Rata Bonus.** If Employee's employment is terminated for reason of death or disability, Employee or his or her estate or its beneficiaries shall be entitled to receive a "Pro-rata Bonus" payable no later than 90 days following the conclusion of the Performance Period in which the termination occurs. For purposes of this Agreement, "Pro-rata Bonus" shall be calculated by multiplying the Minimum Earned Income, Minimum New Business Income, and Production Ranges, as set forth in the Addendum, by a fraction, the numerator of which is the number of days elapsed in the Performance Period through the Termination Date and the denominator of which is the number of days in the Performance Period.

  c. **Applicability of this Provision.** The provisions of this section shall apply irrespective of whether the Employee's employment was terminated lawfully or unlawfully and notwithstanding any notice of termination or pay in lieu of notice to which the Employee may be entitled or any payment made to the Employee by way of salary continuance or otherwise.

5. **NON-SOLICITATION; NON-COMPETITION; CONFIDENTIAL INFORMATION AND NON-DISCLOSURE**

  a. **Confidentiality/Non-Disclosure Obligation.**

   i. Employee will not disclose to anyone in any way, directly or indirectly, Employer's Confidential Information or improperly make use of Employer's Confidential Information both

2

during Employee's employment with Employer and at any time after Employee's employment with Employer terminates or expires, whether such termination or expiration is voluntary or involuntary. Specifically, but not by way of limitation, except as necessary for the performance of Employee's duties and responsibilities for Employer, at no time during or after Employee's employment with Employer, shall Employee directly or indirectly (nor instruct, request or encourage any other person or entity to directly or indirectly) use any trade secret or confidential or proprietary information (including, but not limited to, agent lists, client lists, contract terms, ratings, expirations, renewals, business plans, costs, pricing and/or financial information) belonging to Employer.

ii.     Employee acknowledges, however, that Employer has, in this provision, given Employee notice that, pursuant to federal law, an individual may not be held criminally or civilly liable under any federal or state trade secret law for disclosure of a trade secret: (i) made in confidence to a government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; and/or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Additionally, an individual suing an employer for retaliation based on the reporting of a suspected violation of law may disclose a trade secret to his or her attorney and use the trade secret information in the court proceeding, so long as any document containing the trade secret is filed under seal and the individual does not disclose the trade secret except pursuant to court order.

b.     **Return of Company Property.** Employee agrees that all Confidential Information, whether embodied in hard copy, electronic media, or other forms, or copies thereof, is the property of Employer exclusively. Employee agrees that upon the termination or cessation of Employee's employment with Employer, whether voluntary or involuntary, that Employee will immediately return to Employer all Confidential Information, Company property, and client property, in any form, including, but not limited to, hard copy and electronic form, and in any media in which such information is recorded or stored, including electronically on any electronic storage device of any kind. Employee agrees that Employee shall acquire no property rights or claim to the Confidential Information or any other property of Employer or its clients. Employee agrees and acknowledges that any Confidential Information given to Employee by Employer or that Employee is permitted to use for Employee's employment Employer remains Employer's property and that Employee has no right to keep such things, use them for non-Company use, retain them upon Employee's termination or cessation of Employee's employment with Employer, or use them in competition against Employer at any time.

c.     **Proprietary Rights and Works For Hire.** Employee agrees that all work and creation of work products associated with this Agreement or Employee's employment with Employer during Employee's employment are deemed works for hire for Employer. In consideration of employment with Employer, Employee assigns and transfers to Employer all rights of any kind and nature (including without limitation any royalties, other income, and property rights) in discoveries, inventions, patentable material, copyrightable materials, designs, methods, and any other work products whatsoever. Employee further agrees that Employee shall cause to be furnished to Employer such instruments, instructions, and documentation as Employer may reasonably require to ensure that the aforesaid rights shall belong to Employer upon request or at the end of Employee's employment. Employee shall return all proprietary information to Employer. Employee also agrees and understands that Employee cannot use as a defense to any improper misappropriation or retention of trade secrets that Employee thought Employee was entitled to use or retain such trade secrets because Employee created it or assisted in creating it.

d.     **Restrictive Covenants.** Employee agrees further that in order to preserve the confidentiality of the

3

Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect Employer's client and account relationships, with both its prospective and existing clients, to protect its client goodwill, and to protect Employer from improper or unfair competition, Employee will not, directly or indirectly, during Employee's employment and for a period of two (2) years from the date Employee's employment with Employer ends, terminates or expires, for any reason whatsoever, whether such termination or expiration is voluntary or involuntary, perform any of the following activities.

    i.    **Non-Solicitation of Company Officers, Employees, or Contractors.** Employee will not, directly or indirectly, solicit, divert, or attempt to solicit or divert, from Employer any officer, employee, contractor or any person providing services to, or on behalf of, Employer, or influence any such person to no longer serve as an officer, employee or contractor, or provide services to, or for, Employer.

    ii.    **Non-Solicitation of Company Clients and Accounts.** For the purposes of this Agreement, "Employee's Team" shall be defined as all persons who are supervised by Employee and all persons' performance upon which Employee's Management Bonus is based. Employee will not: (i) call upon, contact, solicit, divert, service, or accept any business from any Burns & Wilcox client or account for the purposes of directly or indirectly providing any services or products similar to those offered by Employer, including, but not limited to, distribution, underwriting, financing, claims, loss control and/or audits; (ii) directly or indirectly solicit, divert, service or accept on behalf of any new employer or new entity any insurance policy for a particular insured party for which insured party the Employee or any member of Employee's Team had provided such services or attempted to provide services in the two years prior to the end of Employee's employment with Employer. For the purposes of this Agreement, "client" or "account" shall include any insurance solicitor, insurance agent, insurance broker, insurance producer, insurance wholesaler, managing general agent, risk manager, third party administrator or otherwise with whom Employee or any member of Employee's Team had written, quoted or been asked to write or quote contracts and/or policies, facilitated placement or otherwise provided brokerage services to on behalf of Employer during the two (2) years preceding the date of Employee's termination and/or resignation from Employer. For the purposes of this Agreement, "account" shall include any insurance policy Employer or any member of Employee's Team had written, quoted or been asked to write or quote during the two (2) years preceding the date of Employee's termination and/or resignation from Employer.

    iii.    **Non-Competition.** During Employee's employment with Employer, Employee shall not directly or indirectly engage in any action or provide support, assistance or services to any other person or entity, if such activity would constitute competition with Employer's business. This proscription shall not apply to solely passive investments to which Employee provides no advisory, consulting, employment or solicitation services.

e.    **Irreparable Harm.** Employee acknowledges that Employer has a legitimate need to protect itself from improper or unfair competition and to protect its Confidential Information, as well as Employer's client and account relationships with both its prospective and existing clients and accounts, to protect its client goodwill, and that the restrictions contained in this Agreement are reasonable and necessary to protect Employer's operations, legitimate competitive interests, and Confidential Information. Employee also recognizes the highly competitive nature of Employer's business and that irreparable harm would be caused by Employee's violation of the restrictions contained herein.

f.    **Remedies/Damages.** Employee agrees that Employer's remedies at law for any violation of this Agreement are inadequate and that Employer has the right to seek injunctive relief in addition to any other

remedies available to it. Therefore, if Employee breaches this Agreement, Employee agrees that Employer has the right to, and may seek issuance of a court-ordered temporary restraining order, preliminary injunction and permanent injunction, as well as any and all other remedies and damages, including monetary damages. In the event that Employee breaches this Agreement after the termination or expiration of Employee's employment, whether voluntary or involuntary, the two (2) year time period set forth in this Section 5 shall be tolled during the period of Employee's non-compliance or violation in order to provide Employer with the full restricted period to which it is entitled under this Agreement.

g.  **Duty to Disclose Agreement and to Report New Employer.**  Employee acknowledges that Employer has a legitimate business purpose in the protection of its trade secrets, proprietary information, competitive position, methods of operation, processes, procedures and vendors. Employee also recognizes and agrees that Employer has the right to such information as is reasonably necessary to inform Employer whether the terms of this Agreement are being complied with. Accordingly, Employee agrees that for a period of two (2) years following Employee's termination of employment, Employee will promptly and forthrightly provide any new employer with a copy of this Agreement and notify the new employer of Employee's obligations contained in this Agreement.

6.  **TERMINATION AND WAIVER OF JURY TRIAL.**

Employee agrees to bring any claims that Employee may have against Employer within 180 days of the day that Employee knew, or should have known, of the facts giving rise to the cause of action and waive any longer, but not shorter, statutory or other limitations periods. This includes, but is not limited to, the initial filing of a charge with the Equal Employment Opportunity Commission and/or state equivalent civil rights agency. However, Employee understands that Employee will thereafter have the right to pursue any federal claim in the manner prescribed in any right to sue letter that is issued by an agency. Employer further agrees to waive any right to a jury trial in action commenced by Employee or Employer that arises under this Agreement.

7.  **GENERAL PROVISIONS**

a.  **Maintenance of Records.**  Employer will be responsible for maintaining all appropriate records. Any Bonus due will be calculated according to Employer's records.

b.  **Taxation of Bonus.**  Any payments made to the Employee pursuant to this Agreement will be subject to all applicable withholdings under applicable law, including on account of income taxes. Any and all taxes payable in respect of any payment under this Agreement (including any penalties, fines or interest arising therefrom) shall be the sole responsibility of the Employee. The Employer shall, to the extent permitted by law, have the right to deduct from any payment any federal, provincial, foreign and local laws relating to the withholding of tax or other levies on employment compensation in relation to payments contemplated in this Agreement.

c.  **No Fiduciary Duty.**  Nothing contained in the Agreement and no action taken pursuant to the Agreement shall create or be construed to create a trust of any kind or any fiduciary relationship between the Employer and the Employee or other persons.

d.  **Reasonable Interpretation and Modification.**  The provisions of this Agreement are intended to be interpreted and construed in a manner so as to make such provisions valid, binding and enforceable. In the event that any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, then such provision shall be deemed to be modified to the extent necessary to make such provision valid, binding and enforceable, or, if such provision cannot be modified or restricted in a manner so as to make such

5

provision valid, binding and enforceable, then such provision shall be deemed to be excised from this Agreement and the validity, binding effect and enforceability of the remaining provisions of this Agreement shall not be affected or impaired in any manner.

e.  **No Guaranty of Employment.** This Agreement shall not constitute a condition of employment nor a commitment on the part of the Employer to ensure the continued employment of the Employee. Nothing in the Agreement shall confer upon an Employee any right to continue in the employ of the Employer or affect in any way the right of the Employer to terminate his or her employment at any time.

f.  **Prior Agreements Inoperative.** This Agreement represents the entire agreement between the parties, and it shall supersede any and all prior written and oral agreements covering its subject matter. By way of example, but not by way of limitation, all prior bonus agreements between Employee and Employer, including, but not limited to, any prior Incentive Plan Agreements, are null and void.

g.  **Choice of Law and Venue.** This Agreement is made in Michigan and shall be governed in all respects under the laws of the State of Michigan without respect to any other state's choice of law rules, statutes or regulations. Venue of any action regarding the terms and conditions of this Agreement or any action arising under this Agreement shall be brought in the State courts of Michigan in Oakland County, Michigan or in the Federal court for the Eastern District of Michigan, Southern Division. Employee waives any objections Employee may have to lack or personal jurisdiction or venue in any Michigan court. Both parties hereby waive any defense to lack of jurisdiction, improper forum, forum *non conveniens*, or improper venue, and waive any right to attempt to seek a change of venue or change of forum in the event an action is properly filed in the State of Michigan.

h.  **Understanding of Agreement.** Employee acknowledges that he/she has read and understood the terms and conditions of this Agreement and acknowledges and agrees that he/she has had the opportunity to seek and was not prevented nor discouraged by the Employer from seeking any independent legal advice which it considered necessary prior to the execution and delivery of this Agreement and that, in the event that he/she did not avail himself/herself of that opportunity prior to signing this Agreement, he/she did so voluntarily without any undue pressure, and agrees that his/her failure to obtain independent legal advice will not be used by him/her as a defense to the enforcement of his/her obligations under this Agreement.

i.  **Entire Agreement.** This Agreement represents the entire understanding between Employee and Employer regarding its contents and supersedes any prior or contemporaneous agreements, and any such prior or contemporaneous agreements are hereby integrated herein. Any alteration, modification, or waiver of any provision of this Agreement shall not be valid unless in writing and signed by all parties.

j.  **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of Employer and its respective successors and assigns, and upon Employee and any of Employee's heirs, personal representatives, and assigns, except that Employee's duties hereunder may not be delegated or assigned.

k.  **Survival.** Sections 5, 6 and 7 of this Agreement shall survive the termination of this Agreement.

l.  **No Conflict and Non-Use.** Employee acknowledges and agrees that Employee is not subject to any other agreement or restriction from a prior employer or any other entity that prohibits Employee's employment or association with Employer Company or with Employee's execution of this Agreement. Employee acknowledges and agrees that Employee shall not use, disclose, share, or in any way misappropriate the trade secrets of any prior employers for the benefit of Employer or for use at Employer.

6

Employee understands that Employer prohibits the improper use of any other company's trade secrets for use of Employee's employment with Company, and that Employer has no obligation to defend Employee if an action for such misappropriation or improper use of trade secrets is brought against Employee by any former employer or any other party. Any such improper use or misappropriation of trade secrets is not, and Employee recognizes and acknowledges that it is not, within the scope of Employee's employment, and if doing so, Employee will not be doing so as the agent of Employer, but such acts will be deemed to be outside the scope of Employee's employment with Employer.

m. **Execution and Counterparts.** This Agreement may be executed in counterparts and any copies, facsimiles, or electronic transmissions or scans shall be treated as originals.

**This Agreement is between:**

Burns & Wilcox Ltd.
(hereinabove and hereinafter designated as the "Employer")

and

_____
(hereinabove and hereinafter designated as the "Employee")

| EMPLOYER | EMPLOYEE |
|---|---|
| Signature: *[signed]* | Signature: *[signed]* |
| Name: Daniel J. Kaufman | Name: Amanda Ruppal |
| Title: COO | Title: Managing Director |
| Date: May 28, 2019 | Date: 5/24/19 |

7